UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| RAYMOND J. WIMBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 2:19-cv-00314-JRS-MJD |
| | ) |
| JACKIE WEST-DENNING, | ) |
| SAMUEL J. BYRD, | ) |
| BARBARA J. RIGGS, | ) |
| WEXFORD OF INDIANA, LLC,[1] | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Raymond Wimber, an Indiana inmate, brought this action under 42 U.S.C. § 1983 alleging that the defendants were deliberately indifferent to his serious medical condition in violation of his Eighth Amendment rights.[2] The defendants have moved for summary judgment. Dkt. 115. The plaintiff does not oppose the motion for summary judgment as to defendants Dr. Byrd and Nurse Riggs. Dkt. 123 at 2. For the reasons discussed in this Order, the defendants' motion is **granted**.

**I.
Summary Judgment Standard**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material fact" is one that "might affect the outcome of the suit." *Anderson v.*

---

[1] The **clerk is directed** to update the docket to reflect that defendant "Wexford Health Services" is actually "Wexford of Indiana, LLC" as reflected in the caption of this Order. *See* dkt. 124 at 1.
[2] Recruited Counsel has ably represented Mr. Wimber, and the Court is grateful for counsel's efforts in this matter.

*Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Ind. Univ.,* 870 F.3d 562, 573-74 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## II.
## Factual Background Including Material Facts in Dispute

Mr. Wimber was incarcerated at Wabash Valley Correctional Facility at all times relevant to this action. Wimber Deposition, dkt. 117-6 at 13-14. On October 22, 2017, Mr. Wimber submitted a healthcare request form that stated, "I have a growth on the left side of my face. I have a history of skin cancer in my family." Dkt. 117-4 at 157.

2

### A. December 8, 2017

Dr. Denning first met with Mr. Wimber on December 8, 2017. Denning Deposition, dkt. 117-1 at 34-35. The parties dispute what transpired during this visit. Dr. Denning testified that she diagnosed the lesion on Mr. Wimber's face and another on his scalp as benign seborrheic keratosis. *Id*. at 41. Dr. Denning was confident the lesions were not cancerous and did not need to be removed, but Mr. Wimber remained anxious that they were. *Id*. Dr. Denning's first choice of treatment would have been to monitor the lesions over time. *Id*. at 46. Her second choice would have been to shave the lesions, but she performed shave biopsies with flexible number 10 blades and such blades were not kept at the prison for security reasons. *Id*. at 27, 44, 46, 154-55. Her third choice would have been a punch biopsy. *Id*.

Instead of these less invasive options, Dr. Denning performed two excisional biopsies—her least favored treatment option—at the prison infirmary during her initial appointment with Mr. Wimber. *Id*. at 34-35; 46. She used a number ten blade scalpel and closed the wounds with two layers of size 3-0 sutures: one layer of dissolvable sutures beneath the surface and one layer of non-dissolvable sutures on the skin's surface. *Id*. at 55-58. She offered to write an order for Ibuprofen or Tylenol, but Mr. Wimber declined because he already had both. Dkt. 117-1 at 74.

The parties dispute whether Mr. Wimber requested the two excisional biopsies. Dr. Denning testified that Mr. Wimber wanted the lesions completely removed because his wife did not like them. *Id*. at dkt. 117-1. Mr. Wimber testified that he only wanted the lesion on his cheek looked at and documented. Dkt. 117-6 at 16-17. Dr. Denning did not discuss the lesion or biopsy process with him, although he did sign a consent form for a biopsy on the left side of his face. *Id*. at 19-20; dkt. 117-4 at 156. He did not know the difference between a punch and

3

excisional biopsy, and he did not learn that the lesion was benign seborrheic keratosis until he received the results of the biopsy. Dkt. 117-6 at 24-25.

Dr. Byrd testified that Wexford expected a benign skin condition like seborrheic keratosis to be treated onsite. Byrd Deposition, dkt. 117-5 at 48-49. Dr. Denning testified that it was difficult to get approval for an inmate to be seen by a dermatologist unless the condition was pathological. Dkt. 117-1 at 69-70. Dr. Denning further testified that she was permitted by Wexford to perform any medical procedure within her own comfort zone, and she had performed hundreds of biopsies in her medical residency. *Id*. at 18-19; 24-25.

Mr. Wimber testified that Dr. Denning sent a nurse to Dr. Denning's car to retrieve a head lamp in the middle of his procedure, that the headlamp was not sterilized, and that Dr. Denning adjusted the head lamp and continued his procedure. Dkt. 117-6 at 27-28. Dr. Denning does not recall the details of this interaction, but she testified that if there was a lighting issue during a procedure, she would rescrub her hands and apply fresh sterile gloves after adjusting the lights and before resuming the procedure. Dkt. 117-1 at 56-57.

Mr. Wimber's expert, Dr. Dilly, testified that Dr. Denning should have shaved the growths rather than excising them. Dkt. 117-7 at 119-20. A shave procedure is usually performed with a number 15 blade but could also be done with a number 10 blade "with no problem." *Id*. at 118-19. A shave biopsy creates an abrasion on the skin which does not require suturing, but like an excision, it can remove the entire lesion which can then be sent to pathology. *Id*. at 109−10; 120. Dr. Dilley places the risk of infection with a shave biopsy in the range of one in 100,000. *Id*. at 110-11.

Dr. Dilley also testified that once Dr. Denning had performed the excision, she selected a two-layer closure when he would have used a single-layer method because "the risk of infection is

4

dramatically lower." *Id*. at 52. Finally, Dr. Dilley testified that Dr. Denning selected sutures that were too large. Dr. Dilley would have used 5-0 and 6-0 sutures for this procedure instead of the 3-0 size Dr. Denning selected. Dkt. 117-7 at 52-53, 120-22. Dr. Dilley testified that wounds on the face only result in infection in one out of every 300 or 400 cases. *Id*. at 114. Dr. Dilley therefore ascribes Mr. Wimber's infection to a subpar surgical "technique or operative environment." *Id*.

### B. December 13, 2017

On December 11, 2018, Mr. Wimber submitted a healthcare request form because he was experiencing pain and swelling at the biopsy sites and had not been provided antibiotics or pain medication. Dkt. 117-4 at 155. Dr. Denning examined Mr. Wimber on December 13, 2017. Although Mr. Wimber reported that green pus was coming from his sutures, Dr. Denning testified that the excision sites looked as she expected. She saw no drainage and did not believe the wounds were infected, but she cleaned the wounds anyway. Dkt. 117-1 at 76-78. However, her "provider plan" from that visit states "[l]eft check biopsy site with dark drainage." Dkt. 117-4 at 53. The physical exam notes from that visit also state that Mr. Wimber's cheek wound was swollen and red. *Id*.

Dr. Denning testified that Mr. Wimber said he wanted the sutures taken out so she removed them, even though it increased his risk of infection and could lead to a longer healing process. *Id*. at 77-79. She prescribed antibiotics and pain medication, took a culture which later returned negative for infection, and ordered twice daily dressing changes. *Id*. at 77; 80-81; dkt. 117-6 at 35-36.

Dr. Dilley testified that, based on his review of the medical records, he believes Mr. Wimber's wounds were infected on December 13, 2017, and that Dr. Denning's treatment of Mr. Wimber on this date was "adequate" and "appropriate." Dkt. 117-7 at 65-66. The medical

5

records indicate that Mr. Wimber's dressings were only changed sporadically. However, Mr. Wimber kept a detailed medical log and verified in his complaint many additional dressing changes by various nurses that do not appear in the defendants' records. Mr. Wimber testified that the dressing changes he received were not always done properly. Dkt. 117-6 at 41. A wound care log indicates that purulent drainage, an indicator of infection, was observed during dressing changes on eight occasions between December 14, 2017, and January 9, 2018. Dkt. 117-4 at 200. Other medical records from this time period document drainage from the wounds ranging from thick and brown to greenish-yellow. Dkt. 117-4 at 34-37.

### C. December 24, 2017

Dr. Denning examined Mr. Wimber on December 24, 2017, and noted that his cheek wound had increased in size. In response, she cleaned the wound, took another culture which again returned negative for infection, and changed his dressing orders. *Id*. at 46. Dr. Denning also removed a loose stitch from Mr. Denning's scalp and his pain in that area later subsided. Dkt. 116-6 at 63-64. At this time, Mr. Wimber had active prescriptions for doxycycline and tramadol. Dkt. 116-5 at 54.

Mr. Wimber still experiences numbness, tingling, and heat sensations on his cheek. The last time he sought treatment for these symptoms was on January 26, 2018. *Id*. at 62.

### III.
### Analysis

Because Mr. Wimber is a convicted prisoner, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

6

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain." *Pyles v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [the Court] perform[s] a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727-28 (7th Cir. 2016) (en banc).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles,* 771 F.3d at 409. The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). Even a showing of medical malpractice is not sufficient. *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020). "Rather, the evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.* at 1030–31. "This is essentially a criminal recklessness standard." *Davis v. Kayira*, 938 F.3d 910, 915 (7th Cir. 2019) (quotation marks omitted); *see Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) ("[N]egligence, gross negligence, or even recklessness as the term is used in tort cases is not enough.").

"If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016)). But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks and quoted authority omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions

7

unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The Court defers to the treatment decisions made by medical staff "unless no minimally competent professional would have so responded under those circumstances" because "there is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (internal quotation marks and citations omitted).

### A.  Nurse Barbara Riggs and Dr. Samuel Byrd

Mr. Wimber has abandoned his claims against Nurse Riggs and Dr. Byrd. Dkt. 123 at 2 ("Plaintiff's recruited counsel recognize that respondeat superior liability for Dr. Denning's conduct does not apply in 42 U.S.C. §1983 cases and therefore no response to the motion for summary judgment is being submitted with respect to Mr. Wimber's claims against Dr. Byrd and Nurse Riggs."). Therefore, summary judgment is **granted** in favor of Nurse Riggs and Dr. Byrd.

### B.  Wexford

Mr. Wimber argues that Wexford maintained a de facto policy of not permitting its physicians to refer patients with seborrheic keratosis for outside treatment. Dkt. 123 at 19-20. Because Wexford acted under color of state law by contracting to perform a government function—providing healthcare to inmates—it is treated as a government entity for purposes of Section 1983 claims. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 379, 381 (7th Cir. 2017) (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786 (7th Cir. 2014) and *Monell v. N.Y.C. Dep't of Soc.*

8

*Servs.*, 436 U.S. 658 (1978)). As such, Wexford "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of respondeat superior for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional . . . policies or customs." *Simpson v. Brown Cty.*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (citing *Monell*, 436 U.S. at 690-91)). To prove a deliberate indifference claim against Wexford, Mr. Wimber must establish (1) that he suffered a constitutional deprivation, and (2) that the deprivation was the result of an express policy or custom of Wexford, or due to its failure to promulgate a necessary policy. *Glisson*, 849 F.3d at 379, 381.

Mr. Wimber argues that Wexford's de facto policy of requiring its physicians to treat seborrheic keratosis in-house, combined with Dr. Denning's failure to follow the standard of care, resulted in Mr. Wimber's harm. Dkt. 123 at 20. But, as stated above, Wexford cannot be held liable for constitutional violations committed by Dr. Denning. *Simpson*, 860 F.3d at 1005-06. And Mr. Wimber has presented no evidence that denying Mr. Wimber access to an outside specialist was a constitutional violation. The parties agree that his condition was benign and could have been treated by simply monitoring it over time. Thus, Wexford is entitled to summary judgment.

### C. Dr. Denning

#### a. December 8, 2017

The parties do not dispute that Mr. Wimber's seborrheic keratosis was benign and did not require treatment. It therefore was not a serious medical condition. *Pyles,* 771 F.3d at 409 ("A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson."). In any event, Mr. Wimber has not pleaded any facts to suggest that Dr. Denning acted with a state of mind equivalent to criminal

recklessness. Dr. Denning examined Mr. Wimber, excised lesions of concern using an acceptable procedure, and continued to follow up to ensure complete recovery from that procedure.

Mr. Wimber contends that the risk of infection was serious and that Dr. Denning acted with deliberate indifference to that risk when she opted to excise the lesions on his cheek and scalp. Mr. Wimber's expert, Dr. Dilley, testified that the risk of infection after an excision is one in three or four hundred. Dkt. 117-7 at 114. Despite this slight risk, Dr. Denning chose to excise Mr. Wimber's lesions and send them for lab testing.

Dr. Dilley testified that he too would have removed the lesions and sent them to pathology. But he would have chosen to perform a shave biopsy instead of an excision. And if he did an excision, he would have used a different method to close the resulting wound. *Id*. at 52-53, 119-22. But such disagreements between physicians as to the best course of treatment are generally insufficient to establish deliberate indifference.

"[T]here is no single proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett*, 937 F.3d at 1023. Dr. Denning did not feel comfortable performing a shave biopsy without a flexible razor which was not available in the prison due to security concerns. Mr. Wimber has not presented evidence that "no minimally competent professional would have so responded under those circumstances." *Id.* No reasonable juror could conclude that Dr. Denning's decision to excise the lesions was deliberately indifferent.

Furthermore, Mr. Wimber's contention that Dr. Denning adjusted a headlamp during the procedure without re-scrubbing her hands might support a negligence claim, but it does not rise to the level of deliberate indifference. *Holloway*, 700 F.3d at 1073 (deliberate indifference requires more than negligence; the standard is akin to criminal recklessness).

Because no reasonable juror could find that Dr. Denning acted with criminal recklessness, or that she was otherwise deliberately indifferent to any serious medical need suffered by Mr. Wimber, Dr. Denning is entitled to summary judgment as to her care of Mr. Wimber on December 8, 2017.

### b. Medical Staff's Post-Procedure Wound Care

Dr. Denning is entitled to summary judgment on Mr. Wimber's claims regarding the post-procedure wound care he received from nurses and other medical staff. Medical records, combined with Mr. Wimber's detailed account of his care contained in his verified complaint, show that he did not always get two dressing changes each day as Dr. Denning had ordered. And he testified that the dressing changes he received were not always done properly. Dkt. 117-6 at 41. But Dr. Denning cannot be held responsible for the care provided, or not provided, by other medical staff. *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015) ("For constitutional violations under § 1983 [], a government official is only liable for [] her own misconduct.") (citation and quotation marks omitted).

### c. December 13, 2017

On December 13, 2017, Dr. Denning examined Mr. Wimber after he reported that his wounds were infected. Although she did not observe signs of infection, she removed his sutures, cleaned and dressed the wounds, prescribed antibiotics and pain medication, took a culture which later returned negative for infection, and ordered twice daily dressing changes. Dkt. 117-1 at 77; 80-81; dkt. 117-6 at 35-36. Mr. Wimber's expert testified that, based on his review of the medical records, he believes Mr. Wimber's wounds were infected on December 13, 2017, and that Dr. Denning's treatment of Mr. Wimber on this date was "adequate" and "appropriate." Dkt. 117-7 at

65-66. There is no dispute of material fact as to the adequacy of Dr. Denning's care on December 13, 2017, and she is therefore entitled to summary judgment as to her care on that date.

### d. December 24, 2017

Dr. Denning examined Mr. Wimber on December 24, 2017. She cleaned his wounds, took another culture which again returned negative for infection, and changed his dressing orders. Dkt. 117-1 at 46. Mr. Wimber had active prescriptions for doxycycline and tramadol. Dkt. 116-5 at 54. Mr. Wimber makes no argument in his response brief that Dr. Denning acted with deliberate indifference to a serious medical need on December 24, 2017, and no deliberate indifference is apparent in the record. Thus, Dr. Denning is entitled to summary judgment as to her care on that date.

## IV.
## Conclusion

For the reasons discussed above, the defendants' motion for summary judgment, dkt. [115], is **granted**. Final judgment consistent with this Order shall issue at this time.

**IT IS SO ORDERED.**

Date: 2/8/2022

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

RAYMOND J. WIMBER
197729
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

W. Scott Montross
c/o INDIANAPOLIS LEGAL AID SOCIETY
smontross@4mklaw.com

John F. Townsend, III
TOWNSEND & TOWNSEND LLP
townsendlawfirm@aol.com

Jarod M. Zimmerman
KATZ KORIN CUNNINGHAM, P.C.
jzimmerman@kkclegal.com